# In The Matter Of:

ROMANO  v. ROUNDY'S ILLINOIS

21 CV 1463

---

# Testimony of:

JEFFREY ATKINS

August 16, 2021

---

Cynthia A. Pavesich & Associates
105 West Madison Street
Suite 1350
Chicago, Illinois 60602
(312) 214-1992
cagoodreporter@pavesich.com
www.pavesich.com

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS


ELIZABETH ROMANO,                    )
                                     )
              Plaintiff,             )
                                     )
     -vs-                            ) No.  21 CV 1463
                                     )
ROUNDY'S ILLINOIS, LLC,              )
                                     )
              Defendant.             )


        The deposition of JEFFREY ATKINS, herein,

taken before Stephanie Apostolos, a Certified

Shorthand Reporter within and for the County of Cook

and State of Illinois, via Zoom videoconference on

August 16, 2021, commencing at the hour of 1:00 p.m.


Reported for:  Cynthia A. Pavesich & Associates


By:  Stephanie Apostolos, CSR

ROMANO  v. ROUNDY'S ILLINOIS  JEFFREY ATKINS                    21 CV 1463

```
                                                        Page 2

 1   PRESENT:

 2

 3        DRISCOLL LAW OFFICES,
          BY:  MR. JOHN DRISCOLL,
 4             (1770 Park Street, Suite 205
               Naperville, Illinois 60563)
 5             (630) 548-6600
               jdriscoll@driscolllawoffices.com
 6             Appeared via Zoom videoconference on
               behalf of the Plaintiff;

 7

 8        KOPKA PINKUS DOLIN, PC,
          BY:  MR. GREGORY T. GLEN,
 9             (200 West Adams Street, Suite 1200
               Chicago, Illinois 60606)
10             (312) 782-9920
               Gtglen@kopkalaw.com
11             Appeared via Zoom videoconference on
               behalf of the Defendant.

12

13

14

15

16

17

18

19

20

21

22

23

24
```

ROMANO  v. ROUNDY'S ILLINOIS  JEFFREY ATKINS                    21 CV 1463

Page 3

1                          I   N   D   E   X

2

3

4

WITNESS:                                      PAGE:LINE

5

6    JEFFREY ATKINS

7

8

Examination by Mr. Driscoll                    5, 8

9

10

11

EXHIBITS:

12

13

(None marked)

14

15

16

17

18

19

20

21                      --oOo--

22

23

24

ROMANO  v. ROUNDY'S ILLINOIS  JEFFREY ATKINS                    21 CV 1463

                                                        Page 4

 1              THE COURT REPORTER:  Before we proceed,

 2     pursuant to Illinois Supreme Court Rule 206(h)

 3     regarding remote electronic means depositions,

 4     pursuant to Section 319 of the Public Health Service

 5     Act, I will ask counsel to agree on the record that

 6     there is no objection to this Certified Shorthand

 7     Reporter administering a binding oath to the witness

 8     remotely.

 9              MR. DRISCOLL:  John Driscoll for the

10     plaintiff, no objection.

11              MR. GLEN:  Greg Glen for the defendant, no

12     objection.

13                   (Witness sworn.)

14              MR. DRISCOLL:  This is the deposition of

15     Mr. Atkins taken pursuant to the applicable federal

16     rules.  I'm going to be asking you some questions

17     today; a couple of the ground rules.  Just let me

18     finish asking my question before you respond.  Make

19     all of your answers verbal so the court reporter can

20     take everything down.  If you don't understand any of

21     my questions, let me know and I'll be happy to

22     rephrase them.  Okay?

23              THE WITNESS:  Yes.

24

Page 5

1              JEFFREY ATKINS,

2   called as a witness herein, having been first duly

3   sworn, was examined and testified via Zoom

4   videoconference as follows:

5

6              E X A M I N A T I O N

7   BY MR. DRISCOLL:

8        Q.   Can you tell me what's your highest level of

9   education?

10       A.   I have a bachelor's degree.

11       Q.   Where is that from?

12       A.   Southern Illinois University in Carbondale.

13       Q.   When did you get that?

14       A.   I graduated in 1990.

15       Q.   And where did you go to work when you

16   graduated?

17       A.   I was with Venture Stores.

18       Q.   Where did you start out with Venture Stores?

19       A.   Waukegan, Illinois.

20       Q.   I'm sorry.  What position?

21       A.   Asset protection manager.

22       Q.   What type of store is Venture Stores?

23       A.   It was a big box retail similar to a Walmart,

24   for example, without food.

Page 6

1      Q.   Okay.  I got ahead of myself.  What did you

2   graduate in?  What were you studying?

3      A.   I studied administration of justice

4   specializing in security management.

5      Q.   Did you join a police force or anything like

6   that?

7      A.   No.  I went into the asset protection, the

8   private security-type retail security, private

9   security, after college.

10     Q.   What was the nature of your position at

11  Venture Stores?

12     A.   External theft, internal theft prevention,

13  shrink control for all departments.

14     Q.   How long did you work at Venture Stores?

15     A.   I worked at Venture I think it was three

16  years or so.

17     Q.   Where did you go after that?

18     A.   After Venture I went to Toys R Us.  I did a

19  similar position for Toys R Us.

20     Q.   Sort of security, essentially?

21     A.   Yes.

22     Q.   How long were you there?

23     A.   Toys R Us, 8 years, 7, 8 years.

24     Q.   Where did you go after that?

ROMANO  v. ROUNDY'S ILLINOIS  JEFFREY ATKINS                    21 CV 1463

                                                          Page 7

1        A.    Then after that I was Jewel Osco.

2        Q.    Jewel Osco.  What did you start out for Jewel

3   Osco?

4        A.    I was in a training position, manager

5   training position, and I focused on all areas of the

6   store, all perishable, all grocery.  It was a training

7   program throughout the store.

8        Q.    How long were you at Jewel?

9        A.    About 13 years or something.

10       Q.    For the most part were you a manager there?

11       A.    Yeah, the latter part of my career I was the

12   store director for them.

13       Q.    How many years were you store director?

14       A.    Let's see.  I went for about five years of my

15   career.

16       Q.    Without going into too much detail, just give

17   me a thumbnail sketch of your duties and

18   responsibilities in that position.

19       A.    So duties and responsibilities are hiring,

20   coaching team members, merchandising, shrink control,

21   food safety, overall customer safety, overall employee

22   safety, team member safety, store cleanliness and P

23   and L responsibilities.

24       Q.    We're going to talk about an incident that

ROMANO   v. ROUNDY'S ILLINOIS   JEFFREY ATKINS                21 CV 1463

Page 8

1   took place September 28th of 2020 at Mariano's.  I

2   guess the focus is going to be in the safety with

3   respect to the store area itself.

4           Did you have what's called a U-boat cart?

5   Was that part of Jewel?

6       A.   Yes, Jewel Osco used U-boats, yes.

7       Q.   Would it be the same type of size as the ones

8   used at Mariano's?

9       A.   Very similar.

10      Q.   Ws there -- well, strike that.

11          Generally speaking did you have any policies

12  and procedures with respect to loading the shelves and

13  the freezers at Jewel?

14      A.   Yes.

15      Q.   Tell me about those.

16      A.   Well, proper loading was that when you're

17  using a U-boat is to make sure that it's safely

18  stacked, was at a proper height, not too much over the

19  top of the U-boats for visibility.  You want to pull

20  the U-boat versus not push so for visibility.  When

21  you get to your area, you want to make sure that you

22  have access for the customers on both sides so there's

23  a free path for the customers on each side, and you

24  want to make sure that you are using safe lifting and

ROMANO  v. ROUNDY'S ILLINOIS  JEFFREY ATKINS                    21 CV 1463

Page 9

1   turning and twisting procedures so you don't want to

2   make sure yourself is hurt while loading the product

3   to the shelf.

4       Q.   Those are the policies at Jewel; is that

5   right?

6       A.   Yes, and it's a similar policy at Mariano's

7   as well.

8       Q.   Are there any distinctions with respect to

9   the policies at Mariano's with respect to the use of

10  U-boats placing product on the floor?

11      A.   You mean directly on to the floor or from the

12  U-boat to the shelf?

13      Q.   Using the U-boat to place product on either

14  of a shelf?

15      A.   They are very similar to Mariano's.  You want

16  to make sure that we're pulling the U-boat, not

17  pushing it, a safe height, a very stable stacking of

18  the U-boat so it doesn't cause a tipping hazard,

19  making sure there's a path on each side for the

20  customer so the customer is clear, it's a very clear

21  egress and coming back and forth by the U-boat.  I

22  always encourage that the team member greets the

23  customer.  We always want to greet our customers, and

24  then safe lifting and safe twisting to avoid injury,

ROMANO  v. ROUNDY'S ILLINOIS  JEFFREY ATKINS                    21 CV 1463

Page 10

1   and of course we never want to have product on to the

2   floor, directly on to the floor.

3       Q.   Going back to Jewel, were there any actually

4   written policies with respect to the use of U-boats

5   are any other type of carts in the placing of product

6   on shelves and freezers?

7       A.   To my knowledge, I don't remember those.

8       Q.   How about with respect to Mariano's, is there

9   anything in writing which spells out the policies and

10  procedures in terms of what to do and not do when

11  placing product on the floor either on a shelf or in a

12  freezer?

13      A.   To my knowledge I don't know of any.  It's

14  just during the course of training when you're

15  training with one of your mentors and one of your

16  training people.

17      Q.   Okay.  So the policy you went over is

18  something that somebody at Mariano's would learn in

19  training; is that right?

20      A.   Yeah.  You would be trained, typically

21  assigned a training buddy and you would learn those

22  procedures then.

23      Q.   With respect to Jewel, going back to Jewel,

24  was there any prohibition with respect to using

ROMANO   v. ROUNDY'S ILLINOIS   JEFFREY ATKINS                21 CV 1463

                                                          Page 11

1   U-boats on the floor while the store is open?

2       A.   No.  It's an acceptable practice as long as

3   it's done in a safe manner.

4       Q.   How about is there any type of cart that was

5   prohibited to be used at Jewel in terms of unloading

6   product on the floor during working hours?

7       A.   The only thing that's not allowed is going to

8   be something that it's a power industrial truck,

9   something that's power generated, power movement.

10      Q.   How about with respect to Mariano's -- well,

11  strike that.

12           Did you go from Jewel to Mariano's?

13      A.   No, from Jewel I went to Meijers.

14      Q.   And what did you do at Meijer?

15      A.   Same position, store director.

16      Q.   And what was the -- give me roughly the time

17  frame you were at Meijer, just approximately?

18      A.   So that was roughly -- approximately I had

19  been with Mariano's one year, so it was probably three

20  years ago I was with Meijer and then with Mariano's in

21  the last one year.

22      Q.   Okay.  So when did you start with Mariano's,

23  what month?

24      A.   April 2020.

Page 12

1      Q.   April of 2020.  Okay.  Does Meijer, do they

2  use U-boats?

3      A.   Yes.

4      Q.   Any prohibitions of using U-boats when the

5  store was open?

6      A.   No, not that I'm aware of.

7      Q.   Was safety of the actual store floor itself

8  part of your responsibilities at Meijer?

9      A.   Yeah, safety would be under my umbrella of

10  responsibility, yes.

11      Q.   Same with Mariano's, correct?

12      A.   Yes.

13      Q.   Going back to -- Well, the U-boat used in

14  Mariano's back in September of 2020, am I correct it's

15  approximately 8 to 10 inches off the ground?  Does

16  that sound right?

17      A.   Approximately, yes.

18      Q.   If you have a better estimate, tell me.

19      A.   No, it seems reasonable.

20      Q.   It's approximately a little over five feet

21  wide?

22      A.   Approximately, yes.

23      Q.   I'm sorry.  Five feet long?

24      A.   Yes, approximately, yes.

ROMANO  v. ROUNDY'S ILLINOIS  JEFFREY ATKINS                    21 CV 1463

                                                          Page 13

1        Q.   How about the width?

2        A.   Width is probably approximately 12, 13 inches

3    or so, maybe somewhere in that area.

4        Q.   So with respect to -- It's your belief that

5    that particular configuration of that cart, there's no

6    safety risk at all for patrons of the store in any

7    capacity; is that true?

8        A.   Well, as long as it was safely stacked, it

9    was very stable, it wasn't stacked too high, and then

10   also you had a path on each side for the customer,

11   that would have been acceptable.

12       Q.   Okay.  Is there any -- your colleague

13   testified on Friday.  Is there any -- well, strike

14   that.

15            Is there an appropriate distance from either

16   a shelf or a cooler where that U-boat should be

17   placed?

18       A.   Well, you just want to have, for example, a

19   cart width would be acceptable on each side.  Or a

20   path for the customer to walk through, safely walk

21   through on each side.

22       Q.   So you're thinking approximately 12, 13

23   inches on each side if one of your employees parked it

24   there, that would be a safe area to park the U-boat if

ROMANO  v. ROUNDY'S ILLINOIS  JEFFREY ATKINS                    21 CV 1463

Page 14

1   they wanted to unload?

2       A.   Well, it would be enough for a person to walk

3   safely on each side.

4       Q.   Okay.  Initially you said the width of the

5   cart itself.  Are you saying an amount that somebody

6   could walk safely, is that more than 12 or 13 inches

7   or less or what do you think?

8            THE COURT REPORTER:  Did we freeze?

9            MR. DRISCOLL:  We froze.

10               (Whereupon, a discussion was held

11                off the record.)

12  BY MR. DRISCOLL:

13      Q.   Did you hear my question?

14      A.   No, could you repeat it?

15      Q.   Sure.  You initially said that a safe

16  distance would be a cart length on both sides; is that

17  right?

18      A.   That would be ideal, yes.

19      Q.   But you also indicated just enough where a

20  patron can walk between the shelf and the cart.  Is

21  that distance more or less than 12 to 13 inches?

22      A.   Well, the idea would be a cart.  If there was

23  not enough room, he would have a nice pathway for the

24  customers to walk past on each side.  There could be,

ROMANO v. ROUNDY'S ILLINOIS JEFFREY ATKINS                    21 CV 1463

                                                           Page 15

 1   sometimes there's rounders or something in an aisle

 2   but, again, you would position that U-boat so a

 3   customer could have a safe path on each side.

 4        Q.   Okay.  I don't mean to mince words.  Are you

 5   saying 12 to 13 inches is sufficient or should it be

 6   more or just depends on the circumstance?  You tell

 7   me.

 8        A.   Ideal would be a little bit more than 12

 9   inches.

10        Q.   Okay.  So you feel that if something a little

11   bit over 12 inches, a couple more inches than 12

12   inches?  Is that what you're saying?

13        A.   Well, I would have to, again, I would say

14   over 12 inches would be something that's needed.

15        Q.   Okay.  Over 12 inches.  You feel that would

16   be an appropriate place to park a U-boat when you're

17   placing product on either shelves or -- Is that what

18   you're saying?

19        A.   Well, again, I would position the U-boat so a

20   customer or myself could have a clear, safe path on

21   each side of that U-boat.  At 12 inches, I would like

22   it a bit more than 12 inches.

23        Q.   And is there -- should there be -- When

24   you're saying it's appropriate you can park it that

ROMANO  v. ROUNDY'S ILLINOIS  JEFFREY ATKINS                    21 CV 1463

                                                        Page 16

 1    distance away from the shelf or the freezer, should

 2    there be egress from both sides of the cart?

 3         A.   On each side there should be a clear path for

 4    the customer, yes.

 5         Q.   Well, for example, if a cart is -- if a

 6    U-boat is parked next to a freezer, should there be an

 7    ability to get out of that area between the freezer

 8    and the cart from both sides of the U-boat?

 9         A.   Both sides, yes, that would be acceptable.

10         Q.   Would it not be acceptable if you were only

11    able to enter the area between the shelf or freezer

12    and the U-boat from one side to not be able to walk

13    all the way through to exit?

14         A.   No, you would want a path on both sides.

15         Q.   Okay.  So from a safety perspective, that

16    would be your expectation that there would be a path

17    if you're walking between a shelf or a freezer and a

18    U-boat, you be able to walk all the way through and

19    exit, keep going straight and exit; is that right?

20         A.   Yeah, you'd want a clear path on either side

21    of the U-boat, that's correct.

22         Q.   And if someone parked the U-boat that didn't

23    have the clear path on both sides, that would be

24    something you feel would be unsafe?

ROMANO  v. ROUNDY'S ILLINOIS  JEFFREY ATKINS                    21 CV 1463

                                                        Page 17

1        A.   It would be something that I want them to

2   correct.

3        Q.   That's because it's a potential safety

4   hazard?

5        A.   Could be, yes.

6        Q.   All right.  How about with respect to the

7   aisle of the store itself, with respect to your

8   expectations as a manager who's in charge of safety,

9   how much room should be allowed with respect to the

10  aisle to walk through the aisle with respect to the

11  U-boat?

12       A.   Well, my expectation would be enough distance

13  for a customer to proceed on each side in a clear,

14  safe, manner.

15       Q.   I asked you about Jewel.  Are there any

16  prohibitions against using a U-boat while the store is

17  open?

18       A.   To my knowledge, no.

19       Q.   When you say to your knowledge, would there

20  be anyone else who would be more knowledgeable?

21       A.   I'm not sure of that, sir.

22       Q.   Okay.  Where do you fall on the hierarchy of

23  management at the Mariano's in Crystal Lake?

24       A.   At that time I was the store director in

ROMANO  v. ROUNDY'S ILLINOIS  JEFFREY ATKINS                    21 CV 1463

                                                            Page 18
 1   charge at that point.

 2       Q.   Okay.  So similar responsibilities to the

 3   ones you had at Jewel?

 4       A.   Correct.

 5       Q.   So you were the main boss, right?

 6       A.   Yes.  And if I didn't have the information, I

 7   would know who to call to get access to the

 8   information.

 9       Q.   Okay.  With respect to the U-boats that are

10   used at Mariano's that were used back in September of

11   '20, in the event that there is no cargo on a U-boat,

12   if you would look -- if you're facing it you would

13   look all the way through because it's an empty space,

14   right?

15       A.   We instruct our team to pull it rather than

16   push it.

17       Q.   Well, that's a bad question.

18            So what I'm saying is if it's stopped and in

19   an aisle and hypothetically somebody has unloaded

20   everything that was on there, if you're facing the

21   U-boat, all you would see is there would be a shelf

22   that's approximately 8 inches from the ground and then

23   there would be an arm, so to speak, a left and a right

24   at the edge, at each edge of the cart; is that right?

ROMANO v. ROUNDY'S ILLINOIS JEFFREY ATKINS                    21 CV 1463

Page 19

1        A.   At the U-boat, yeah, you would have bars.

2   Technically you have some visibility, but there would

3   be some bars that could obstruct, I'm guessing.

4        Q.   How high are the bars on the left and the

5   right of the U-boat?

6        A.   They are roughly about the five foot high or

7   so.

8        Q.   If someone -- strike that.

9            If one of your employees does park a U-boat

10  close to either a freezer or a shelf, and let's say

11  it's a couple of feet from that freezer or shelf,

12  there would be a potential for a customer to be having

13  their back faced to that U-boat cart at some point; is

14  that right?

15       A.   I guess if they're walking past and they

16  spun, yeah, I guess their back could be at it at a

17  certain point, yes.

18       Q.   And technically if they're walking and

19  looking at the merchandise in the freezer or the

20  shelf, and they're looking at the merchandise, they

21  could be moving sideways as much as four to five feet

22  from the beginning of the U-boat to the end of the

23  U-boat; is that right?

24       A.   If they were clearly unaware of it, unaware

ROMANO  v. ROUNDY'S ILLINOIS  JEFFREY ATKINS                    21 CV 1463

                                                        Page 20

 1    of the U-boat that was in front of them, I guess they

 2    could technically have their back to it, yes.

 3         Q.   But it would be your expectation that per

 4    your safety policies and procedures, even if they had

 5    their back to it, your expectations would be they

 6    could keep walking with their back to it because there

 7    would have to be an opening that they could keep

 8    walking past the U-boat; is that right?

 9         A.   Well, there should be a clear path for them

10    to walk through to get passed the U-boat.  Yes, there

11    should be a clear path on both sides.

12         Q.   And that's your expectation as the safety

13    manager and that's the policy of Mariano's; is that

14    right?

15         A.   Yeah, you want a clear path, a safe, clear

16    path for the customer.

17         Q.   To walk all the way towards the U-boat and

18    then beyond it and keep going, correct?

19         A.   Yes.

20         Q.   In the event that customer was looking at

21    product and had his or her back to the U-boat itself,

22    then they could keep walking indefinitely with their

23    back to it and eventually they would be passed the

24    cart, correct?

ROMANO  v. ROUNDY'S ILLINOIS  JEFFREY ATKINS                    21 CV 1463

                                                          Page 21

1        A.   Yes.  And there's a clear path to walk

2    through and pass the U-boat, yes.

3        Q.   Okay.  What if any expectation is there when

4    you're using a U-boat?  Should you be actively using

5    it the entire time?  Is an employee permitted to leave

6    it there for a certain time to do something else?

7    Tell me about that.

8        A.   You should always be in the area and then

9    when you're done filling and stocking then you remove

10   the U-boat from the area.

11       Q.   Why is that?  Why should you remove it as

12   soon as you're done filling and stocking?

13       A.   Well, you want to make sure that the aisle is

14   free and clear as possible when you're not stocking.

15       Q.   When you say in the area, what do you mean?

16   How much?  What's the vicinity of the area?

17       A.   I don't know if there's a clear distance, but

18   you should be in that area.  You might have an

19   opportunity to step away and help a customer or pick

20   something up if you see something on the ground.  But

21   you should be in that general area and not leave that

22   U-boat for longer periods of time.

23       Q.   Okay.  You either should be actively

24   unloading the product from the U-boat or helping a

ROMANO  v. ROUNDY'S ILLINOIS  JEFFREY ATKINS                21 CV 1463

Page 22

1  customer or doing something else related to your job;

2  is that right?

3      A.   Yeah.  There could be a brief time when

4  you're leaving it if you go to help a customer pick

5  something up, to help somebody, yes, there could be a

6  time when you're not always by the U-boat.

7      Q.   Is there any -- I believe some product if not

8  all that's loaded on to the U-boat to be placed on the

9  floor is in boxes; is that right?

10      A.   Well, you want to avoid anything on the

11  floor.

12      Q.   I'm sorry.  You cut out.

13      A.   Yeah, you would not want them directly on the

14  floor but, yeah, they would be boxes, yes.

15      Q.   Let me clarify.  So typically when an

16  employee brings out a U-boat with product, that

17  product is in cardboard boxes; is that right?

18      A.   The majority, yes.  It could be something of

19  totes, but generally it is in boxes.

20      Q.   What is the custom and practice in terms of

21  when you take the product out of the cardboard box?

22  What do your employees do in terms how do you deal

23  with the cardboard box and how do you stack a

24  particular load?

ROMANO  v. ROUNDY'S ILLINOIS  JEFFREY ATKINS                    21 CV 1463

                                                            Page 23

1        A.    Typically you keep the cardboard within the

2   U-boat area or on the U-boat and you're kind of

3   working from one side to the other in the U-boat

4   moving the product to one side to keep it all on the

5   U-boat.

6        Q.    Would there be an occasion to have just a

7   regular shopping cart where you place the cardboard?

8        A.    That's really not a best practice, no.

9        Q.    Why not?

10       A.    I mean, we have used that in the past, yes.

11       Q.    You said it was not a best practice.  Why

12   not?

13       A.    Well, you want to make sure that all the

14   shopping carts are available for the customer.  They

15   are designed for the customer, so we don't want to use

16   those as equipment.  The U-boat is designed to move

17   product.  You can put your cardboard there.  The carts

18   are generally for the customer.

19       Q.    Okay.  Would you also agree it's not the

20   policy of Mariano's to park a regular shopping cart

21   next to a U-boat and place the cardboard in there?

22   That's not something you would recommend as the

23   manager?

24       A.    It's not a best practice.  It does happen,

ROMANO  v. ROUNDY'S ILLINOIS  JEFFREY ATKINS                     21 CV 1463

                                                          Page 24

1    but my overall thought, the overall is that the

2    customers -- the carts are designed for customers.

3    They should be used for the customer.  It does happen

4    where there were team members who use the cart for

5    cardboard.

6        Q.   And in that situation you wouldn't expect

7    them to place the shopping cart next to the U-boat,

8    would you?

9        A.   As long as there was a clear path, safe,

10   clear path on each side for the customer.

11       Q.   Okay.  But if there was not a safe, clear

12   path on both sides, your expectation as a safety

13   manager would be that that shopping cart shouldn't be

14   there; is that right?

15       A.   Well, again, it could be there.  My overall

16   thought is that I'd like the customers to have access

17   to the shopping carts.  If it was there, my

18   expectation would be there's a clear path on each

19   side.

20       Q.   Your expectation would be a clear path.  If

21   there wasn't a clear path by the placement of the

22   cart, then you would expect that that shopping cart

23   should be moved, correct?

24       A.   Yeah, they should always work towards a clear

ROMANO  v. ROUNDY'S ILLINOIS  JEFFREY ATKINS                21 CV 1463

Page 25

1   path for the customer on each side.

2        Q.   Are there any type of -- What other types of

3   carts are used to stock the shelves and the freezers

4   at Mariano's other than the U-boat?

5        A.   There are various types of carts.  There's

6   five carts that are used in produce.  There's U-boats.

7   There's various metal carts.  Primarily the grocery

8   department which is our frozen, dairy, that is one

9   vehicle.  U-boat is a common vehicle to stock, but

10  there are some different types in a grocery store.

11       Q.   Are there any of these different -- How many

12  different types are there?

13       A.   There was at least three to four that I know

14  of.

15       Q.   Are any of those types of carts or any types

16  of those carts prohibited from being used to stock

17  shelves while the store is open for business?

18       A.   No, not prohibited.  The only thing that is

19  prohibited is battery equipment, battery powered

20  equipment.

21       Q.   How about -- okay.  We talked at the other

22  deposition about pallet jacks.  Is that a battery

23  powered equipment?

24       A.   Well, there is a non-battery, you know, a

ROMANO  v. ROUNDY'S ILLINOIS  JEFFREY ATKINS          21 CV 1463

Page 26

1   manual power jack.  Those are to transport pallets on

2   the sales floor.  That is a safe way to use a pallet

3   jack on the sales floor.

4        Q.   A non-motorized pallet jack, is that

5   appropriate --

6        A.   Non-power, non-battery pallet jack.

7        Q.   Pallet jack.  That's appropriate to use on

8   the floor during working hours?

9        A.   Yeah, that's an approved way to transport

10  product and on a pallet.

11       Q.   What, if anything, did you review to prep for

12  the dep today?  And I'm not asking what you spoke to

13  with your counsel?

14       A.   No, this is all the knowledge that I have as

15  far as my work environment.

16       Q.   Did you look at any videos to prep for the

17  deposition?

18       A.   Yeah, I did see some video photographs of the

19  incident.

20       Q.   Were they still photographs or were they

21  videos?

22       A.   They were still photographs.

23       Q.   All right.  Okay.  And did you learn about

24  this particular incident on September 28th at any

ROMANO  v. ROUNDY'S ILLINOIS  JEFFREY ATKINS                    21 CV 1463

                                                            Page 27

 1    point while you were working at the store?  Strike

 2    that.

 3              Were you working on September 28th?

 4        A.   Based on the information, yeah, I was at the

 5    store that day, yes.

 6        Q.   Did you witness this accident?

 7        A.   I did not.

 8        Q.   Did you speak to any one of your employees

 9    about the accident?

10        A.   I did not.

11        Q.   Did you speak to my client, Ms. Romano, at

12    any time?

13        A.   I did not.

14        Q.   Did you come upon the scene after the

15    accident itself at any time?

16        A.   I don't recall the incident.

17        Q.   What if any role did you have in

18    investigating this incident?

19        A.   Like I said, I have no recollection of the

20    incident.

21        Q.   But as of the date of the incident and as of

22    today, you're familiar with the safety policies and

23    procedures with respect to the use of carts in the

24    delivering of product on the floor, correct?

ROMANO  v. ROUNDY'S ILLINOIS  JEFFREY ATKINS                    21 CV 1463

                                                          Page 28

 1      A.   Yeah, what I stated about how to use the

 2   U-boat, correct.

 3      Q.   And are there any written policies and

 4   procedures at Mariano's with respect to how to bring

 5   product on to the floor and to place it on shelves or

 6   freezers?

 7      A.   To my knowledge right now I don't know of

 8   any.

 9      Q.   So it's really based upon your training and

10   experience and then the training that your employees

11   receive when they're hired, essentially?

12      A.   That's correct, yes.

13      Q.   Did you learn anything else about this

14   incident, again, putting aside what you may have

15   talked to with Mr. Glen, anything else that you

16   learned about this incident that you haven't told me

17   about?

18      A.   No.

19      Q.   And how many still photos did you look at?

20   Can you tell me what was depicted?

21      A.   Still photos, roughly ten still photos.

22      Q.   We're kind of working with this Zoom

23   situation.  Generally describe what the photos

24   depicted.

ROMANO   v. ROUNDY'S ILLINOIS   JEFFREY ATKINS                    21 CV 1463

                                                        Page 29

1         A.   It shows the customer shopping along some

2    bunkers, we call them refrigerated bunkers.  I see her

3    walking towards the U-boat, passed the U-boat, and it

4    seems to me like she just kind of takes a turn to her

5    right and then trips over to the U-boat.

6         Q.   You never reviewed her deposition, correct?

7         A.   I did not see it, no.

8         Q.   And so you really don't know exactly what she

9    was looking at at the various points of that

10   photograph; is that true?

11        A.   That's correct.

12        Q.   And you can't really say how far she traveled

13   from the point of the U-boat that she reaches the

14   U-boat to the point where she stops and the point

15   where she turns; is that right?

16        A.   That's correct.  I can give an estimate but I

17   don't know the exact distance.

18        Q.   With respect to what she was able to see when

19   she turns towards the U-boat, you really have no idea

20   because you don't know what she testified and you're

21   not able to see through her eyes, essentially; is that

22   right?

23        A.   That's correct.

24        Q.   And you don't know from looking at those

ROMANO  v. ROUNDY'S ILLINOIS  JEFFREY ATKINS                    21 CV 1463

Page 30

1   photos, you don't know how much product is on that

2   particular U-boat on the date of the accident; is that

3   right?

4        A.   I don't know the exact amount, no.

5        Q.   And do you know how full the U-boat was by

6   looking at the photo?

7        A.   I can give an estimate of what's on the

8   photo.

9        Q.   Neither one of us want you to guess.  If

10  you're able to estimate for us, go ahead.  If not, say

11  you don't know.

12       A.   I don't know.

13       Q.   Okay.

14            MR. DRISCOLL:  That's all I have.

15            MR. GLEN:  I have no questions, John.  We'll

16  waive signature.

17            MR. DRISCOLL:  Thank you.  We're all done.

18  Thanks.

19            MR. GLEN:  Thank you.

20            THE WITNESS:  Thank you.

21

22            FURTHER DEPONENT SAITH NOT

23                      --oOo--

24

ROMANO  v. ROUNDY'S ILLINOIS  JEFFREY ATKINS                21 CV 1463

Page 31

1  STATE OF ILLINOIS  )
                      )  SS.
2  COUNTY OF C O O K  )

3

4          I, Stephanie Apostolos, a Certified

5  Shorthand Reporter in and for the County of Cook and

6  State of Illinois, do certify that heretofore on,

7  to-wit, August 16, 2021, personally appeared before

8  me via Zoom videoconference, JEFFREY ATKINS, produced

9  as a witness for discovery examination in said cause.

10          I further certify that the said witness,

11  JEFFREY ATKINS, was by me first duly sworn to testify

12  the truth, the whole truth, and nothing but the truth

13  in the cause aforesaid before the taking of the

14  deposition; that the testimony was reduced to writing

15  by means of machine shorthand and afterwards

16  transcribed into typewriting, and that the foregoing

17  is a true and correct transcript of the testimony

18  given by said witness.

19          I further certify that there were present

20  at the taking of the deposition the previously-named

21  individuals.

22          I further certify that I am not counsel for

23  nor in any way related to any of the parties to this

24  suit, nor am I in any way interested in the outcome

ROMANO  v. ROUNDY'S ILLINOIS  JEFFREY ATKINS                    21 CV 1463

Page 32

1    thereof.

2            I further certify that my certificate

3    annexed hereto applies to the original and

4    typewritten copies only, signed and certified

5    transcripts only.  I assume no responsibility for the

6    accuracy of any reproduced copies not made under my

7    control or direction.

8            In testimony whereof, I have hereunto set

9    my hand this 7th day of October, 2021.

10

11

12

13                         Stephanie Apostolos, CSR
                              CSR No. 84-3286

14

15

16

17

18

19

20

21

22

23

24